EDWARD P. FOLEY & another[1] *vs*. POLAROID CORPORATION.

Middlesex. September 12, 1986. — May 21, 1987.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*False Imprisonment. Libel and Slander. Employment,* Termination. *Contract,* Employment. *Husband and wife,* Consortium. *Emotional Distress. Malicious Prosecution. Damages,* False imprisonment.

At the trial of an employee's false imprisonment claim against his employer, the defendant was not entitled to a directed verdict, where its proof depended upon oral evidence and where it had the burden of proving that its confinement of the plaintiff, in the course of its investigation of an accusation against him, had been undertaken in a reasonable manner and continued for no longer than a reasonable time. [89-90]

At the trial of an employee's false imprisonment claim against his employer, the judge erred in instructing the jury, in effect, that an employee at will who relinquishes his right to move about freely, as the only available alternative to losing his employment, is restrained or imprisoned in the sense that imprisonment is an element of the tort of false imprisonment. [90-92] LIACOS, J., dissenting.

At the trial of an employee's false imprisonment claim against his employer, the defendant was entitled to have the jury instructed that, on all the evidence, it was for them to say whether the confinement of the plaintiff exceeded the limits of reasonableness. [92]

In a false imprisonment action by an employee against his employer, the employee was not precluded from recovering damages for any emotional distress suffered as a result of the employer's conduct, on the ground that such harm is compensable exclusively under provisions of the Workmen's Compensation Act, G. L. c. 152, §§ 1 et seq. [92-93]

At the trial of an employee's defamation claim against his employer, and his wife's claim for loss of consortium resulting from the defamation, the plaintiffs had the burden of proving that the defendant had abused its common law conditional privilege to disclose defamatory information concerning the employee, and the jury were not warranted in returning verdicts for the plaintiffs where there was no evidence that any of the allegedly defamatory statements, made among employees of the defend-

---

[1] Mary Foley.

ant corporation and concerning matters reasonably related to its legitimate business interests, was either excessively published or made with reckless disregard for truth or falsity. [93-96]

At the trial of a wife's claim against her husband's employer seeking damages for loss of consortium arising from its intentional infliction of emotional distress on him, the evidence was insufficient to warrant the jury's finding that the employer's conduct toward the husband, following his acquittal on a charge that he had sexually assaulted a coworker on company premises, had risen to the level of "extreme or outrageous conduct" requisite to the tort of intentional infliction of emotional distress. [96-100] LIACOS, J., & ABRAMS, J., dissenting.

At the trial of an employee's claim of malicious prosecution arising from his employer's allegedly instituting criminal proceedings against him after a coworker accused him of sexually assaulting her on company premises, the evidence was insufficient to permit the jury to find malice on the part of the employer, that is, that the employer knew there was no probable cause for the prosecution and that it acted with an improper motive. [100-101]

CIVIL ACTION commenced in the Superior Court Department on September 26, 1978.

After a judgment of dismissal was reversed by this court, 381 Mass. 545 (1980), the case was tried before *Rudolph F. Pierce*, J.

The Supreme Judicial Court granted a request for direct appellate review.

*Stephen B. Deutsch* (*Robert L. Cowdrey* with him) for the defendant.

*Robert Emmet Dinsmore* (*Lester M. Gold* with him) for the plaintiffs.

O'CONNOR, J. In 1978, the plaintiffs Edward P. Foley (Foley) and his wife, Mary Foley, filed a complaint in the Superior Court against the defendant Polaroid Corporation (Polaroid). Foley was an employee of the defendant. The Foleys sought recovery, on a variety of theories, for damages allegedly resulting from Polaroid's actions beginning in June, 1976, when a coworker accused Foley of sexually assaulting her on company premises.

Polaroid moved to dismiss the action for lack of subject matter jurisdiction, arguing that Foley's injuries were compens-

able under the Workmen's Compensation Act, G. L. c. 152, §§ 1 et seq., and that the Act provided the Foleys' exclusive remedy. See G. L. c. 152, §§ 23-24. A judge granted the motion to dismiss. The Foleys appealed, and we ordered direct appellate review on our own initiative. We affirmed the judgment of the Superior Court "to the extent that the complaint raises a claim for intentional infliction of mental distress," but reversed the judgment "to the extent that the complaint raises claims for defamation, malicious prosecution, a violation of civil rights, and loss of consortium." *Foley* v. *Polaroid Corp.*, 381 Mass. 545, 554 (1980) (*Foley I*).[2]

The Foleys later amended their complaint by adding claims for false imprisonment and related loss of consortium. Polaroid then moved for summary judgment, which was denied except for the claims predicated on a violation of civil rights.

The case was tried before a jury, and the jury returned verdicts for the Foleys. Foley was awarded $1,500,000 on his malicious prosecution claim, $1,000,000 on his defamation claim, and $500,000 on his false imprisonment claim. Mary Foley was awarded $1,500,000 for loss of consortium arising out of intentional infliction of emotional distress, and $500,000 for loss of consortium arising out of defamation. The trial judge granted Polaroid's motion for judgment notwithstanding the verdict on Foley's malicious prosecution claim, but otherwise denied Polaroid's posttrial motions for judgment notwithstanding the verdict and a new trial or remittitur, and entered separate judgments in accordance with the verdicts.

Polaroid appealed from the judgments entered for the plaintiffs on the claims of false imprisonment, defamation, and loss of consortium, and Foley appealed from the allowance of Polaroid's motion for judgment notwithstanding the verdict on his claim for malicious prosecution. We allowed Polaroid's application for direct appellate review.

---

[2] Chapter 572 of the Acts of 1985, the comprehensive revision of the Workmen's Compensation Act, has now superseded this holding in part and eliminated loss of consortium actions by the families of covered workers for injuries occurring after its effective date. St. 1985, c. 572, §§ 35, 65, 67. See G. L. c. 152, § 24.

Polaroid contends that its confinement of Foley was reasonable as a matter of law, thus entitling it to judgment on the false imprisonment claim. Polaroid also contends that the judge's jury instructions on false imprisonment were erroneous, so that, if it is not entitled to judgment on the claim, it at least is entitled to a new trial. With respect to the claim of defamation and the related claim of loss of consortium, Polaroid challenges the judgment on several grounds, one of which, deemed by us to be dispositive, is that the evidence did not warrant a finding that Polaroid abused its common law conditional privilege to disclose defamatory information concerning its employee. Also, Polaroid challenges the judgment for Mary Foley based on her claim of loss of consortium as a result of Polaroid's intentional infliction of emotional distress on Foley. Polaroid argues that there was insufficient evidence that its conduct was so extreme and outrageous as to warrant recovery. Then, with respect to all of Foley's claims, Polaroid asserts that the trial judge erroneously permitted the jury to compensate Foley for emotional distress arising out of workplace events in contravention of our holding in *Foley I, supra.* Finally, Polaroid contends that the total damages awarded were so excessive that a new trial is warranted on all issues. We need not address this claim.

We reverse the judgments for the plaintiffs, and we affirm the judgment for Polaroid on Foley's claim for malicious prosecution. Judgment is to enter for Polaroid on all claims except Foley's claim for false imprisonment. The case is remanded for a new trial solely on the false imprisonment claim.

We summarize selected portions of the evidence most favorable to the plaintiffs. In early June, 1976, Phyllis Simon, a computer operator employed by Polaroid, reported to a supervisor that Foley, the lead operator on her shift, had sexually assaulted her in a conference room at Polaroid's Waltham facility. The supervisor informed his superiors of the charge. Polaroid management personnel discussed the matter, and then arranged a meeting with Simon for June 22. In addition to Simon and the supervisor to whom she had reported her charge, Raymond Belle, personnel manager for Polaroid's corporate

systems division, John Rutter, director of that division, and James Shea, the corporate security officer at Polaroid, were present at that meeting. Simon repeated her accusation and provided some details of the alleged incident.

Two days after this meeting, Rutter approached Foley near the end of Foley's 11 P.M. to 7 A.M. shift, and asked Foley to accompany him to his office. Foley had bid on a promotion to supervisor of his shift, and had been told that he was a finalist in the competition for the promotion. He thought that Rutter was going to give him a "pep talk" regarding the promotion. When the two men reached Rutter's office, Shea was inside. Rutter introduced Shea and told Foley that Shea was Polaroid's top security officer. Rutter then told Foley that Shea had some questions for him, and that he was sure Foley would cooperate. Foley responded, "Sure, I sure will, no problem." Rutter then left the room and Shea closed the door.

Shea motioned Foley to sit in the chair behind Rutter's desk. Foley was surprised at this and sat down instead in one of the chairs facing the desk. Shea picked up the other chair, positioned it between Foley and the door, and sat down. After Shea explained his responsibilities as security director for Polaroid, Foley asked why Shea wanted to talk to him. Foley thought that perhaps some payroll checks had been stolen or that some other breach of security had occurred. Shea then asked Foley whether and how he knew Phyllis Simon. After Foley responded, Shea informed Foley that Simon had made a serious charge against him involving an incident in a conference room. Foley stated that he was shocked and that he did not know what Shea was talking about. Shea said that he wanted Foley to tell him about the incident. Foley repeated that he did not know what Shea was talking about, and repeated that statement after Shea referred to the incident as a sexual assault. When Foley denied Simon's accusation, Shea told him to admit what he had done. Shea "accused [Foley] of doing it," but told him that it did not have to be a police matter. Shea said three or four times that Polaroid would prosecute Foley if he did not admit to what had happened. Foley said that he would "never admit to something I didn't do like that."

During these exchanges, Foley explained to Shea that he had a history of problems with Simon which had grown progressively worse. He also told Shea that Simon had threatened him numerous times. He explained that Simon knew that Foley was on the verge of becoming her supervisor, and that Simon feared this prospect because Foley knew of her poor job performance. He told Shea that Simon had once said to him, "You won't get that job and I will see to it." Foley named several coworkers who had heard and could verify the threats and the history of conflict Foley had related. Foley asked Shea to bring Simon and Rutter into the room, and told him that this would reveal why Simon had registered accusations against him.

On a number of occasions during this interview Shea approached Foley's chair. Foley testified that "[Shea] would walk around the room, and he would clench his fist, and he would stare at me and tell me to come clean." A few times Foley stood up "because it was easier for [him] to talk while [he] was standing." On these occasions Shea told him to "sit back down" and at all times positioned himself between Foley and the door. At times, while Foley was sitting down, Shea "came and he stood right over [Foley]," and yelled at Foley while the two were thus situated. Foley testified that "I felt I was under arrest, and I thought the only way to get out of that room would be to have a fight with Jim Shea."

At one point in the interview, Foley told Shea that he felt he was going to be sick to his stomach and wanted to use the restroom. Shea told him not to leave, and when Foley began to walk toward the door, Shea pushed his chair against the door. Shea said, "If you go out that door the job goes with you." In the next hour Foley made two or three more requests to use the restroom, after which Shea acceded, telling Foley to come right back and not to talk to anyone. At this time Foley repeated his earlier request to see an employee representative. Approximately two hours had elapsed since Foley first entered Rutter's office.

When Foley returned from the restroom, he was told that Shea had called the Employees' Committee and that William Graney, an employee representative, would arrive as soon as

he could be reached. While the conversation continued along the same lines as before, Shea was still sitting in the chair that was pushed against the closed door. Shea was sitting in the chair with his back to the door when Graney arrived. He moved the chair so that Graney could enter the room. A short time later Shea left the room at Graney's request.

Foley and Graney conversed privately for approximately one hour. A three-way conversation followed when Shea returned to the room. This continued until some time between 11 A.M. and 11:30 A.M., approximately four hours from the time Foley first entered Rutter's office. These events in Rutter's office form the basis of Foley's false imprisonment claim.

Events before and after this interview constitute the basis of Foley's malicious prosecution claim. When Simon first reported her charge to Polaroid officials, she said she did not want to relate in detail the alleged incident in the conference room. In particular, she did not indicate the date on which the incident occurred. Even at the June 22 meeting between Simon, Jones, Rutter, Belle, and Shea, Simon did not elaborate on the incident. Simon told Polaroid officials that she did not want to bring criminal charges against Foley, that she wanted only that Foley be fired from his job, and that she wanted Polaroid to handle the matter internally. Shea had reported to the Waltham police department that there was an allegation of rape at the Polaroid facility.

Later on the same day that Shea interviewed Foley, Shea met with Simon and informed her that Foley had denied the allegations. Four days later Shea met with Simon and discussed with her the procedure she would have to pursue in filing a criminal complaint. Shea then drove Simon to the Waltham police department and introduced her to police personnel. He had talked with one of the police officers earlier.

During Simon's interview with the police, she was asked why she did not report the incident immediately. Simon responded that "Polaroid was handling it" and that "Jim Shea wanted to handle it within the department." There was evidence that Simon had testified before the grand jury that "[t]he corporation said it was a criminal charge and should be outside,

and he should be prosecuted." There was also evidence that in late summer, 1976, Simon said to Rutter, in substance, "I didn't want to push this and if it wasn't for Polaroid I wouldn't be in this position."

Simon provided a statement to the police, which Shea read and witnessed with his signature. Criminal complaints issued the next day from the Waltham District Court charging Foley with assault and battery and rape by virtue of an unnatural act. Probable cause was found by a judge of the District Court, and a grand jury indicted Foley for rape and assault and battery. In June, 1977, a criminal trial was held in the Superior Court. The trial lasted approximately two weeks. The jury returned verdicts of not guilty.

Events occurring after Foley's acquittal form the basis of his defamation claim and Mary Foley's claims for loss of consortium arising from defamation and from intentional infliction of emotional distress. The evidence pertinent to these events will be discussed at appropriate points later in this opinion.

1. *False Imprisonment.*

Polaroid argues that it had a duty to investigate Simon's allegations and that, because of that duty, it had a right to confine Foley in a reasonable manner and for a reasonable time for investigative purposes. *Proulx* v. *Pinkerton's Nat'l Detective Agency,* 343 Mass. 390, 392-393 (1961) ("If the circumstances are such that an investigation is warranted, a person may be detained for a reasonable length of time and in a reasonable way"). Polaroid further argues, in effect, that it was entitled to a directed verdict in its favor on the false imprisonment claim because the evidence did not warrant a finding that it detained Foley unreasonably. We do not agree. Polaroid's argument must fail because Foley did not have the burden to prove that the detention was unreasonable. Rather, Polaroid had the burden to prove reasonableness. With limited exceptions not present here, a verdict dependent on oral evidence cannot be directed in favor of the party with the burden of proof. *Companion* v. *Colombo,* 338 Mass. 620, 623 (1959). *MacKinnon* v. *Medford,* 330 Mass. 70, 71 (1953). That the

burden rests on a defendant to prove that its detention of a plaintiff was reasonable is at least implied, if not expressly held, in *Wax* v. *McGrath*, 255 Mass. 340, 342 (1926). Furthermore, placing on the defendant the burden of proving the reasonableness of confinement, including reasonableness as to time and manner, is consistent with G. L. c. 231, § 94B (1984 ed.), as amended by St. 1985, c. 348, § 2. That statute provides that reasonable grounds for detention and reasonableness as to its time and manner constitute a defense to an action for false imprisonment against merchants and innkeepers.

Polaroid's next argument relative to Foley's claim of false imprisonment is that the judge erred by instructing the jury that "physical force, placement of physical barriers, threats of physical harm, or threats of other harm" may be the means of effectuating an unlawful confinement. Polaroid argues that, on the evidence presented, "threats of other harm" could only refer to a threat of discharge from employment. Foley does not appear to dispute this assertion. We therefore discuss whether a threat of discharge can be the basis of a false imprisonment claim. More particularly, we consider whether a threat of discharge can constitute the imprisonment required to establish such a claim.

We have said that " '[i]f a man is restrained of his personal liberty by fear of a personal difficulty, that amounts to a false imprisonment' within the legal meaning of such term." *Coblyn* v. *Kennedy's, Inc.*, 359 Mass. 319, 321 (1971), quoting *Jacques* v. *Childs Dining Hall Co.*, 244 Mass. 438, 438-439 (1923). In *Jacques*, the plaintiff was a patron of the defendant's restaurant. As she was leaving the restaurant with her guest, who had not eaten, an employee motioned her to come back and asked her why she had paid only one check. The plaintiff answered that her guest had not eaten, and started to go out, but she was told to wait. Following another employee's directions, the plaintiff went to the rear of the restaurant, and an investigation ensued. After a delay of approximately thirty minutes, the manager of the restaurant told the plaintiff, "You may go now." The court concluded that the plaintiff had presented sufficient evidence for the jury to find false imprison-

ment. *Id.* at 441. Rejecting the defendants' contention "that there was no interference with [the plaintiff's] 'freedom of locomotion,' that the detention was lawful, and [the plaintiff] voluntarily remained," the court noted that the plaintiff's "honesty and veracity had been openly and repeatedly challenged. If she had gone out before exoneration, her departure well might have been interpreted by the lookers on as an admission of guilt, or of circumstances from which guilt might be inferred." *Id.*

In *Coblyn*, the plaintiff was a customer of the defendant's clothing store. Mistakenly suspecting the plaintiff of thievery, a store employee ordered the plaintiff to stop as he was leaving the store, firmly grasped his arm, and said, "You better go back and see the manager." A second employee and several other people were standing by, staring at the plaintiff. *Id.* at 320. In rejecting the defendants' argument that no restraint had been shown, the court not only pointed to the employee's grasp of the plaintiff's arm, but also relied on the quotation from *Jacques*, set forth above, concerning the public challenge to the plaintiff's honesty.

The lesson of *Jacques* and *Coblyn* is that a plaintiff who relinquishes his right to move about freely as the only available alternative to relinquishment of another right, such as the right to an unsullied reputation, is restrained, or imprisoned, in the sense that imprisonment is an element of tortious false imprisonment. That is the type of "restrain[t] . . . by fear of personal difficulty" to which the court referred in those cases. But an employee at will who relinquishes his right to move about in return for continued employment, to which he is not entitled, is not imprisoned. He has a free choice.

We know of no case that holds that a threat of discharge from employment at will can effect imprisonment for tort purposes. The Reporter's Note to Restatement (Second) of Torts § 892B (1982 App.) expressly states that threats of discharge from employment are not sufficient to invalidate the consent that contradicts imprisonment. We agree, and our position finds support in cases from other jurisdictions. See *Faniel* v. *Chesapeake & Potomac Tel. Co.*, 404 A.2d 147, 152 (D.C.

Ct. App. 1979) ("fear of losing one's job, although a powerful incentive, does not render involuntary the behavior induced"); *Columbia Sussex Corp.* v. *Hay*, 627 S.W.2d 270, 277-278 (Ky. 1981) ("certainly the restraint evidenced by one's interest in retaining an untenured position must . . . fall short of the standard necessary to prove false imprisonment"); *Moen* v. *Las Vegas Int'l Hotel, Inc.*, 90 Nev. 176, 177 (1974) ("Apprehension that one might in the future lose one's job . . . is not force or the threat of force which is necessary to establish false imprisonment"). See also W. Prosser & W. Keeton, Torts 121 (5th ed. 1984).

We conclude that the judge erred by instructing the jury, at least implicitly, that a threat that Foley would be discharged from employment could be a means of false imprisonment. A new trial on that claim is necessary because the jury may have based their verdict on that threat alone.[3]

There is another reason to remand the false imprisonment claim for a new trial. As we have said, Polaroid argues, and Foley concedes, that Polaroid had a right to confine Foley for a reasonable time and in a reasonable manner in order to inquire about Simon's allegations. It was for the jury to say on all the evidence whether Polaroid exceeded the limits of reasonableness. Polaroid was entitled to an instruction to that effect, but, despite Polaroid's request, it did not receive such an instruction. That was reversible error.

Because the false imprisonment claim will be the only claim litigated at the new trial, we discuss at this point an issue raised by Polaroid concerning the proper jury instructions on damages. Polaroid argues that the trial judge erroneously instructed the jury that Foley could recover emotional distress damages resulting from false imprisonment. It does not dispute that ordinarily one who has been falsely imprisoned may recover "such dam-

---

[3] We do not imply that the evidence that Shea threatened Foley with discharge was irrelevant or inadmissible. Although, taken alone, the evidence was insufficient to warrant a finding that Foley was unlawfully detained, in conjunction with other evidence it tended to show an atmosphere conducive to a threat of physical confrontation.

ages as are the direct result of [the defendant's] wrongful conduct," *Bilodeau* v. *Maffei*, 309 Mass. 237, 238 (1941), including compensatory damages for "indignity, humiliation and mental suffering, and shame and anguish of mind." 3 B. Lindahl, Dooley Modern Tort Law § 42.16, at 372 (1984 rev.). But Polaroid contends that when the emotional distress· is caused by events in the workplace, recovery therefor is not proper in a legal action because the harm is compensable exclusively under the provisions of the Workmen's Compensation Act, G. L. c. 152, §§ 1 et seq. Polaroid relies upon our decision in *Foley I, supra.*

Polaroid does not contend that Foley's false imprisonment claim was barred by the Workmen's Compensation Act, G. L. c. 152, § 24, but rather that any emotional distress Foley suffered as a result of Polaroid's conduct constituted a personal injury compensable under the Act, and therefore is not allowable as an item of damage in an action at law. Polaroid argues that although the "main thrust of this action" can proceed despite "peripheral items of damage" of the sort compensable under the Act, see *Foley I, supra* at 552, *Foley I* did not contemplate recovery for those peripheral items of damage themselves.

However, *Foley I* did contemplate such recovery. Our inquiry in that case was structured in terms of what *claims* an employee could assert against his employer in an action at law — not in terms of the *injuries* for which the employee could seek recompense. We did not intend that, even though his legal action could proceed, an employee would not be entitled to compensation for those items of loss that are compensable outside the employer-employee setting. Although we expressly "recognize[d] the conceptual problem inherent in the employee's including physical and mental injury as elements of damage in the [legal] claim," *Foley I, supra* at 552, we did not state or imply that the scope of recovery in an appropriate legal action should be restricted, and we are unwilling to say so now.

2. *Defamation.*

The jury returned verdicts for Foley on his claim for defamation and for Mary Foley on her claim for loss of consortium

arising from the defamation. The judge denied Polaroid's motions for judgment notwithstanding the verdicts and entered judgments for the plaintiffs. Polaroid appeals on several grounds. We need not discuss all of Polaroid's contentions. It is enough that the burden was on the plaintiffs to prove that Polaroid abused its common law conditional privilege to disclose defamatory information concerning its employee Edward Foley, and the evidence did not warrant such a finding. Hence, Polaroid is entitled to judgment on both the defamation claim and the affiliated loss of consortium claim.

The Foleys' defamation claim is grounded on four statements allegedly made by Polaroid executives. Each statement was made after Foley was acquitted of the criminal charges arising from Simon's complaint. The four statements were: (1) a statement made by Ann Leibowitz, in-house labor counsel for Polaroid, to William Graney, the employee representative who had earlier represented Foley in connection with Simon's accusations, that "being found not guilty doesn't mean you are innocent"; (2) a statement by John Rutter, director of Polaroid's corporate systems division, made to James Ambrose, manager of computer and telecommunications operations at Polaroid, that Rutter believed "something occurred" between Foley and Simon but "[w]hat it was he didn't know"; (3) Rutter's statement to John Harlor, a vice president or assistant vice president at Polaroid, that "there were continuing allegations that Mr. Foley was approaching other women"; and (4) Rutter's statement in a confidential memo addressed to Harlor and other Polaroid executives that "Foley is beginning to evidence emotional stress in the form of drinking, non attendance, etc." We need not and do not decide whether a jury would have been warranted in finding that these were defamatory statements of fact.

In *Bratt* v. *International Business Machs. Corp.*, 392 Mass. 508, 509 (1984), we said that "[a]n employer has a conditional privilege to disclose defamatory information concerning an employee when the publication is reasonably necessary to serve the employer's legitimate interest in the fitness of an employee to perform his or her job." *McCone* v. *New England*

*Tel. & Tel. Co.*, 393 Mass. 231, 235 (1984). This conditional privilege is a natural corollary of the privilege "to publish defamatory material if the publication is reasonably necessary to the protection or furtherance of a legitimate business interest." *Bratt* at 512-513, citing *Retailers Commercial Agency, petitioner*, 342 Mass. 515, 520 (1961), *Galvin* v. *New York, N.H. & H. R.R.*, 341 Mass. 293, 296 (1960), and Restatement (Second) of Torts § 594 comments e and f, at 265-266 (1977). We also have recognized a qualified or conditional privilege "where the publisher and the recipient have a common interest, and the communication is of a kind reasonably calculated to protect or further it." *Sheehan* v. *Tobin*, 326 Mass. 185, 190-191 (1950). See *Bratt, supra* at 513 n.8. Furthermore, in *Bratt*, we declared, and we reaffirm now, that "[f]or a defendant in a [defamation] case to lose a conditional privilege to publish defamatory material by 'unnecessary, unreasonable or excessive publication,' *Galvin* v. *New York, N.H. & H. R.R.*, [*supra*], the plaintiff must prove that the defendant published the defamatory information recklessly." *Id.* at 509, 515-516. It follows from *Bratt* that when, as here, executives of a corporate employer make statements that defame an employee, and the information disclosed by those statements is reasonably related to the employer's legitimate business interests, the employee has the burden to prove that the statements were made recklessly, that is, that they were unnecessary, unreasonable, or excessively published. Of course, a statement made with knowledge of its falsity or with reckless disregard for the truth would be reckless within the meaning of the rule. *Bratt* at 514. *Tosti* v. *Ayik*, 386 Mass. 721, 726 (1982).

Three of the statements on which the plaintiffs rely were made by one Polaroid executive, Rutter, to other Polaroid executives. The plaintiffs properly do not contend that those statements were excessively published. Rather, the plaintiffs' contention is that there was evidence that they were made with reckless disregard for their truth or falsity. But there was no such evidence. There was no evidence that Rutter did not believe that "something occurred" or that his belief was not reasonably grounded. There was no evidence, for instance,

that Simon ever withdrew her allegation against Foley. Further-more, the Commonwealth's failure to satisfy a jury beyond a reasonable doubt that Foley had assaulted Simon is not evidence that Rutter had no reason to believe that "something," even a sexual assault, had in fact occurred. Similarly, there was no evidence that would have warranted a jury in finding that Rutter lacked a reasonable basis for concluding that the other state-ments attributed to him were true.

The evidence most favorable to the plaintiffs bearing on the statement made by Leibowitz to Graney, on which the plaintiffs rely, was as follows. Leibowitz met Graney, who had originally acted as Foley's representative in connection with Polaroid's investigation of Simon's charges, by chance after Foley had been acquitted. Graney raised the subject of Foley's employ-ment, and asked Leibowitz whether she had heard about the results of the trial. Graney's purpose in raising the subject was to begin the process of "getting [Foley] back" with Polaroid. He asked Leibowitz about the propriety of Foley's being re-turned to his job in Waltham. Leibowitz told Graney that "being found not guilty doesn't mean you are innocent." Even if Leibowitz's statement could reasonably be interpreted as a statement of her belief that Foley had assaulted Simon, a matter we need not decide, the evidence did not warrant a finding that Leibowitz knew that Foley was innocent or that she lacked reasonable basis for thinking he was guilty. Furthermore, the jury would not have been warranted in concluding that making the statement to Graney constituted excessive publication.

Because every alleged defamatory statement made by Polaroid was protected by a conditional privilege, and that privilege was not lost by abuse, Polaroid is entitled to judgment on the defamation claim and the related loss of consortium claim.

3. *Loss of Consortium Arising from Intentional Infliction of Emotional Distress.*

The jury returned a verdict for Mary Foley on her claim for loss of consortium arising from Polaroid's alleged intentional infliction of emotional distress on Foley. The judge denied Polaroid's motion for judgment notwithstanding the verdict

and entered judgment for Mary Foley. Polaroid appeals on two grounds: First, there was insufficient evidence of "extreme and outrageous conduct," and second, there was insufficient evidence that Polaroid's conduct caused any emotional distress that Foley suffered. We agree that, in keeping with the standard set forth in *Raunela* v. *Hertz Corp.*, 361 Mass. 341, 343 (1972), the evidence was insufficient to warrant a finding that Polaroid's conduct toward Foley ever rose to the level of "extreme and outrageous conduct" requisite to the tort of intentional infliction of emotional distress. Therefore, Mary Foley's loss of consortium claim must fail. See Restatement (Second) of Torts, *supra*, § 693(1). Polaroid is entitled to judgment on this claim.

Mary Foley asserts that Polaroid's conduct following Foley's acquittal constituted intentional infliction of emotional distress. We set forth the evidence most favorable to that claim. There was evidence that while the criminal charges were pending, James Ambrose wrote Foley a letter in which he said that "[i]f in our judgment the allegations are without foundations and/or the associated actions did not take place, you will return to your present position." Ambrose testified that he understood from his letter that Foley would be placed back in his prior position if he were found not guilty. After being acquitted, however, Foley was not returned to his former position at Polaroid's Waltham facility, but was instead assigned to another facility in Needham. At Needham, Foley was stationed at a desk in a hallway. Foley testified that this was an inappropriate area for a desk, and that other employees would continuously walk back and forth by his desk throughout the day. During the four months Foley was at Needham, he was not given work to do, and Foley told Ambrose and other Polaroid officials that he wanted assignments. Foley testified that the only assignment he was given at Needham was to clean and inventory an area in the warehouse.

Other allegedly tortious conduct involved Foley's attempts to secure another position within the company. Foley attended twelve to fifteen interviews for jobs within Polaroid during the period he remained at Needham. Raymond Belle told Foley

that he would help him by setting up job counseling and interviews, and perhaps by stepping into the selection procedure on Foley's behalf. Foley testified that Belle never set up the job counseling and never intervened on his behalf during the interview process. There was also evidence that Ambrose, during a meeting with Foley and William Graney, stated that Foley was not wanted back at the Waltham facility. Ambrose explained to Graney that "it was still an uncomfortable situation," and that he did not believe it would be in the best interest of either Foley or "the department" to return Foley to Waltham. Foley expressed to John Rutter that another division would not likely accept him when his former department would not take him back. Both Belle and Ambrose talked to Foley about his poor "track record." John Rutter met with Foley and told him that he did not think Foley was "salary material." Rutter also said that he "was prepared to step in and block any kind of promotion" for Foley. Foley went to Ambrose's office to look at his personnel folder. Foley testified that performance ratings and other positive information in the file were missing.

In support of her claim, Mary Foley also calls our attention to evidence of expressions of belief, by Polaroid officials, that Foley was guilty of the charges of which he had been acquitted by a jury. When Foley told Rutter that he was unhappy with the way Polaroid had handled the Simon matter, Rutter responded that he thought Foley was guilty. Rutter added that "upper management thinks you're guilty." According to Foley's testimony, Rutter then "taunted" Foley with the idea of suing Polaroid, but also told him that Polaroid was "too big a company for you to sue . . . we will wear you out, wear you down." Ambrose also told Foley that he thought him guilty, noted that "that seems to be the feeling," and told Foley that he was "lucky [that Polaroid] brought you back at all." All of the foregoing statements were made to Foley at private meetings.

In February, 1978, Foley was returned to the Waltham facility after a medical leave of absence. At Waltham, according to Foley, Rutter and Ambrose would not talk to him, even to say hello. When Foley and other employees were gathered in

a small group, Rutter and Ambrose would pass by and say hello to the others but not to Foley. Rutter or Ambrose also "turned around and would go back sometimes" when they saw Foley walking towards them down the hallways. Foley also testified to conversations with Rutter concerning Simon. Rutter told Foley that Simon had been asked "if it was all right" that Polaroid return Foley to Waltham. Rutter also told Foley that Simon "has been through a lot" and that he was planning to recommend her for a five-year program at Northeastern University. Finally, Rutter continued to tell Foley that he believed Simon's allegations against him.

In *Agis* v. *Howard Johnson Co.*, 371 Mass. 140 (1976), we accepted as part of the tort law of the Commonwealth a rule of liability for outrageous conduct causing severe emotional distress, even without manifestation of bodily harm. Cf. *George* v. *Jordan Marsh Co.*, 359 Mass. 244 (1971) (recognizing liability for like conduct where bodily harm could be shown). We warned in *Agis*, however, that "the door to recovery should be opened but narrowly and with due caution." *Agis, supra* at 144, quoting from *Barnett* v. *Collection Serv. Co.*, 214 Iowa 1303, 1312 (1932). A principal bulwark against excessively broad recovery is the requirement that the defendant must have engaged in "extreme and outrageous" conduct. See *Agis, supra* at 144-145. Thus, liability cannot be predicated upon "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities," nor even is it enough "that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort"; rather, "[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Restatement (Second) of Torts § 46 comment d (1965). Massachusetts cases have similarly described the limitations upon what can constitute "extreme and outrageous" conduct. See, e.g., *Agis* v. *Howard*

*Johnson Co., supra.* at 145; *George* v. *Jordan Marsh Co., supra* at 254; *Boyle* v. *Wenk,* 378 Mass. 592, 594-595 (1979).

In considering whether a plaintiff has made out a claim for intentional infliction of emotional distress, we have said that the trier of fact "would be entitled to put as harsh a face on the [defendant's actions] as the basic facts would reasonably allow." *Richey* v. *American Auto. Ass'n,* 380 Mass. 835, 839 (1980). Even if it viewed the evidence in this light, however, no reasonable jury could conclude that Polaroid engaged in the "extreme and outrageous" conduct necessary for recovery. Indeed, much of the evidence on which Mary Foley relies is consistent with Polaroid having made a good faith effort to maintain Foley's employment in a manner consistent with Polaroid's legitimate business concerns. Contrary to Mary Foley's argument, the evidence does not warrant a finding that Polaroid engaged in a pattern of conduct constituting a concerted effort to drive Foley out of the company.

4. *Malicious Prosecution.*

The jury returned a verdict for Foley on his claim for malicious prosecution. Foley appeals from the judge's allowance of Polaroid's motion for judgment notwithstanding the verdict and the resulting entry of judgment for Polaroid. There was no error.

"The standard to be used on a motion for judgment notwithstanding the verdict is the same as that on a motion for a directed verdict." *D'Annolfo* v. *Stoneham Housing Auth.,* 375 Mass. 650, 657 (1978). To prevail on his claim for malicious prosecution, Foley was required to show that he suffered damage because Polaroid instituted criminal proceedings against him with malice and without probable cause, and that the proceedings terminated in his favor. See *Beecy* v. *Pucciarelli,* 387 Mass. 589, 593 (1982). We need not consider whether Polaroid instituted the proceedings or lacked probable cause, because, in any event, the evidence did not warrant a finding of malice.

To show malice, the burden was on Foley to demonstrate that Polaroid knew there was no probable cause for the prosecution, and that Polaroid acted with an improper motive. *Beecy*

v. *Pucciarelli, supra*. Sometimes the lack of probable cause is so obvious that an inference of malice is warranted. *Id*. at 594. See *Seelig* v. *Harvard Coop. Soc'y*, 355 Mass. 532, 537 (1969); *Pihl* v. *Morris*, 319 Mass. 577, 580 (1946). But, even if there was no probable cause in this case, a fact that we do not intimate, the evidence did not warrant a finding that the lack of probable cause was so obvious that the defendant more likely than not knew there was no probable cause. To the contrary, the evidence showed that Polaroid's employee, Simon, alleged that Foley had sexually assaulted her on Polaroid's premises.

The judgments for the plaintiffs are reversed. The judgment for Polaroid on Edward P. Foley's claim for malicious prosecution is affirmed. Judgment is to enter for Polaroid on all claims except Edward P. Foley's claim for false imprisonment. The case is remanded for a new trial solely on Edward P. Foley's false imprisonment claim.

*So ordered.*

LIACOS, J. (concurring in part and dissenting in part). I agree with the court's analysis of all but two of the issues raised by these cross appeals. I strongly disagree, however, with the court's treatment of the jury's verdict for Mary Foley on her loss of consortium claim arising from Polaroid's intentional infliction of emotional distress on her husband. Additionally, I do not agree that a threat of discharge from employment cannot support a claim of false imprisonment. In my view, the opinion of the court, and authorities cited therein, are simply unrealistic in their underestimation of what employment, and the threat of its loss, means to an individual in this society. Accordingly, I dissent.

I. *Loss of consortium arising from intentional infliction of emotional distress*. In reviewing the judge's denial of a motion for judgment notwithstanding the verdict, the issue before this court is whether "anywhere in the evidence, from whatever source derived, any combination of circumstances could be

found from which a reasonable inference could be drawn in favor of the plaintiff." *Poirier* v. *Plymouth*, 374 Mass. 206, 212 (1978), quoting *Raunela* v. *Hertz Corp.*, 361 Mass. 341, 343 (1972). In applying this standard, we should examine the evidence in the light most favorable to the plaintiff. See, e.g., *LaClair* v. *Silberline Mfg. Co.*, 379 Mass. 21, 23 (1979). When ruling on a motion for judgment notwithstanding the verdict, we consider neither the credibility of the witnesses nor the comparative weight of the parties' respective evidence. Mass. R. Civ. P. 50 (b), 365 Mass. 814 (1974). See J.W. Smith & H.B. Zobel, Rules Practice §§ 50.2, 50.12 (1977). Nor may we substitute our judgment of facts for that of the jury. 9 C.A. Wright & A.R. Miller, Federal Practice and Procedure § 2524, at 543-544 (1971).[1] J.W. Smith & H.B. Zobel, Rules Practice § 50.6, at 203 (1977), and cases cited therein.

On the facts of this case, it is inconceivable that the court can conclude that nowhere in the evidence, from whatever source derived, any combination of circumstances could be found from which inferences could be drawn in favor of Mary Foley. "This court should not invade the province of the jury by substituting its judgment on questions of fact." *Commonwealth* v. *Bianco*, 388 Mass. 358, 375 (1983) (Liacos, J., dissenting). Other courts have abided by this fundamental principle on similar facts. In *Armano* v. *Federal Reserve Bank*, 468 F. Supp. 674, 676 (D. Mass. 1979), for example, the plaintiff alleged that his employer "undertook a planned and systematic program to harass him in an attempt to force him to voluntarily terminate his employment." He alleged harassment including "transferring him to a less responsible position, assigning him to work which was substantially below his grade and pay level, circulating rumors . . . that plaintiff was caught or suspected of stealing money and directing supervisory per-

---

[1] Since Mass. R. Civ. P. 50 (b) is patterned after the Federal Rule of Civil Procedure 50 (b), *New England Acceptance Corp.* v. *American Mfrs. Mut. Ins. Co.*, 373 Mass. 594, 596 (1977), we may be guided by the construction which Federal courts have given the corresponding Federal rule. *Rollins Envtl. Servs., Inc.* v. *Superior Court*, 368 Mass. 174, 179-180 (1975). See *Martin* v. *Hall*, 369 Mass. 882, 884 (1976).

sonnel to assign plaintiff to the lowest and most menial tasks."
*Id.* Applying Massachusetts law, the judge held that the plaintiff
had raised a question for the jury because there was a factual
question whether such conduct reasonably could be found to
be so extreme and outrageous as to permit recovery.

In the instant case, there was evidence that Edward Foley
was banished from his regular place at work, and was denied
the fruits of what had been a promising career. He was placed
at a desk in an open corridor, and he was treated as a pariah
by his superiors. His personnel files disappeared. He was
taunted and humiliated in front of his fellow employees. He
was given no responsibility and was assigned no work. He
was subjected not to rumors but to direct accusations of conduct
far more serious than stealing money, and was given one assign-
ment, i.e., to clean out and inventory a dirty area of a
warehouse. I cannot join an opinion which so oversteps the
proper role of this court as to conclude summarily that such
allegations do not even raise a question for the jury.

It seems important to note, although the opinion of the court
ignores the rule, that the same rule governs cases alleging
infliction of emotional distress as applies whenever a party to
a civil proceeding moves for a directed verdict or for judgment
notwithstanding the verdict. Where "reasonable men may dif-
fer" as to whether a plaintiff has alleged facts and circumstances
which reasonably could lead the trier of fact to conclude that
the defendant's conduct was extreme and outrageous, the ques-
tion should go to the jury. See Restatement (Second) of Torts
§ 46 comment h (1965). Moreover, as we stated in *Agis* v.
*Howard Johnson Co.*, 371 Mass. 140 (1976), "The jury is
ordinarily in a better position . . . to determine whether out-
rageous conduct results in mental distress than whether that
distress in turn results in physical injury. From their own ex-
perience jurors are aware of the extent and character of the
disagreeable emotions that may result from the defendant's
conduct . . . ." *Id.* at 144, quoting *State Rubbish Collectors
Ass'n* v. *Siliznoff*, 38 Cal. 2d 330, 338 (1952).

In my view, the flaw in the court's analysis is that it isolates
individual incidents and "ignores the fact that the jury are

entitled to draw reasonable inferences from the totality of cir-
cumstances."[2] *Boyle* v. *Wenk,* 378 Mass. 592, 595 (1979),
citing *Poirier* v. *Plymouth, supra* at 212. We have stated that
"[r]epeated harassment . . . may compound the outrageousness
of incidents which, taken individually, might not be sufficiently
extreme to warrant liability for infliction of emotional distress."
*Boyle* v. *Wenk, supra.*

The court errs by invading the province of the jury and
substituting its judgment for that of the jury on questions of
fact. "Jurors saw the witnesses, and their judgment of the
credibility of the witnesses, of the comparable strength of the
conflicting evidence, and of the factual validity of the conten-
tions put forth by each side should be immune from attack."
*Bonin* v. *Chestnut Hill Towers Realty Corp.,* 392 Mass. 58,
77-78 (1984) (Abrams, J., dissenting). It is jurors, not judges,
who decide questions of fact and who apply the law to the
facts. "[W]e have no authority to take upon ourselves the duties
of a tribunal of fact, and to determine what verdicts should
have been rendered by the jury." *Electric Welding Co.* v.
*Prince,* 200 Mass. 386, 392 (1909). What is extreme and
outrageous conduct should be left to the judgment of a jury
who represent the values of the community.

The facts in this case easily support a conclusion that "[m]ore
than one decision was possible to honest and reasonable men,
and, therefore, the jury was the tribunal to determine which
[decision should be reached]." *Hicks* v. *H.B. Church Truck
Serv. Co.,* 259 Mass. 272, 277 (1927). The jury's verdict in
favor of Mary Foley was warranted by the evidence, and the
judgment on this claim should be affirmed.

II. *False imprisonment.* The court concludes that the judge
erred by implicitly instructing the jury that a threat that Foley

---

[2] The court's argument also disregards the Reporter's Note that "[t]he
law [concerning infliction of emotional distress] is still in a stage of develop-
ment, and the ultimate limits of this tort are not yet determined. . . . The
Caveat [to § 46] is intended to leave fully open the possibility of further
development of the law, and the recognition of other situations in which
liability may be imposed." Restatement (Second) of Torts § 46 comment
c (1965).

would lose his job if he left the room where he was being interrogated could be a means of false imprisonment. Although the court's conclusion is supported by cases from other jurisdictions and the Restatement (Second) of Torts § 892 B (1982 App.), I disagree. It seems to me that the court's analysis minimizes and distorts the growing recognition of the centrality of work in a person's life and the fact that "for most employees, their job is the most valuable thing they possess." Summers, Individual Protection Against Unjust Dismissal: Time for a Statute, 62 Va. L. Rev. 481, 532 (1976).

The court states that "an employee at will who relinquishes his right to move about in return for continued employment . . . has a free choice." *Ante* at 91. Judges, secure in their position, are free to make such statements, but such a statement must appear to a worker to be what it is, pure poppycock. Fortunately, this court has not always disregarded the reality of the workplace. In other contexts, we have recognized the illusory nature of such a "free choice." In *Uloth* v. *City Tank Corp.*, 376 Mass. 874, 880 (1978), for example, we observed that "a user may not have a real alternative to using a dangerous product, as where a worker must either work on a dangerous machine or leave his job."

The United States Supreme Court has stated that "[i]t requires no argument to show that the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the [Fourteenth] Amendment to secure" (citations omitted). *Truax* v. *Raich*, 239 U.S. 33, 41 (1915).

As Justice Douglas put it, "it does a man little good to stay alive and free and propertied, if he cannot work." *Barsky* v. *Board of Regents*, 347 U.S. 442, 473 (1954) (Douglas, J., dissenting). Justice Douglas wrote: "The right to work, I had assumed, was the most precious liberty that man possesses. Man has indeed as much right to work as he has to live, to be free, to own property. The American ideal was stated by Emerson in his essay on *Politics*, 'A man has a right to be employed, to be trusted, to be loved, to be revered.' . . . To work means to eat. It also means to live. For many it would be better to

work in jail, than to sit idle on the curb. The great values of freedom are in the opportunities afforded man to press to new horizons, to pit his strength against the forces of nature, to match skills with his fellow man." *Barsky* v. *Board of Regents, supra* at 472 (Douglas, J., dissenting).

It is difficult to overstate the importance of the employment relationship as a focus of security and standing in our society. See, e.g., Glendon & Lev, Changes in the Bonding of the Employment Relationship: An Essay on the New Property, 20 B.C.L. Rev. 457 (1979). "Empirical studies indicate that discharge from employment affects the self-esteem of employees no less severely than it affects their economic well-being. Work serves not only a useful economic purpose but plays a crucial role in the individual's psychological identity and sense of order. The growing recognition of the centrality of work in a person's life, together with an awareness of the severe economic consequences resulting from arbitrary treatment in the employment relationship, supports [the] assertion that employer control over the job means that 'the substance of life is in another man's hands.'" (Footnotes omitted.) Note, Implied Contract Rights to Job Security, 26 Stan. L. Rev. 335, 339 (1974). In my view, the threat of physical force is less significant than the threat of losing one's employment and career as an invalidation of the consent that contradicts imprisonment for purposes of this tort.

Accordingly, while I agree that the false imprisonment claim should be remanded for a new trial because of the judge's failure to give Polaroid's requested instruction regarding the reasonableness of Foley's confinement, I do not join the court's discussion regarding the threat of discharge from employment.

ABRAMS, J. (concurring in part, dissenting in part). While I concur in the reasoning of the court concerning defamation, false imprisonment, and malicious prosecution, I believe the court errs in its analysis of the intentional infliction of emotional distress. The court invades the jury's fact-finding province by concluding that the evidence is consistent with Polaroid's hav-

ing made a good faith effort to employ Foley in a manner consistent with Polaroid's legitimate business concerns. *Ante* at 100. In my view, that conclusion is for the fact finder, not the appellate court. Because the court substitutes its judgment for that of the fact finder, I dissent.

After the jury returned its verdict finding Polaroid liable for intentional infliction of emotional distress, the judge denied Polaroid's motion for judgment notwithstanding the verdict. In our review of the judge's action, we must consider whether "[c]rediting all the evidence favoring the non-moving party, and allowing him all reasonable inferences from such evidence, would the jury be warranted in finding for that party?" J.W. Smith & H.B. Zobel, Rules Practice § 50.2, at 197 (1977). It is clear that if the evidence of intentional infliction of emotional distress is viewed in the light most favorable to the plaintiff, a jury question is presented. See *Hartmann* v. *Boston Herald-Traveler Corp.*, 323 Mass. 56, 59 (1948). The court states that the trier of fact is entitled to put "as harsh a face on the [defendant's actions] as the basic facts would reasonably allow," *ante* at 100, quoting *Richey* v. *American Auto. Ass'n*, 380 Mass. 835, 839 (1980), yet the court then proceeds to state the evidence in a light more favorable to Polaroid than that to which it is entitled.

As the court notes, *ante* at 97, there was evidence that Polaroid informed the plaintiff that if he were found not guilty, he would be returned to his former position. Yet, after the plaintiff was acquitted, the plaintiff was not returned to his former position. Instead, there was evidence that he was assigned to a different facility where there was no area for him to work and where there was no work for him to do. The plaintiff was seated at a desk in the corridor where he was stared at, talked about, and harassed by other workers.[1] The plaintiff had virtually nothing to do for four months. He was ordered to clean and inventory a dirty corner of a warehouse, a task not within his training or ability nor assigned to other

---

[1] Polaroid contends that no one at this facility had a private office. Nevertheless, no one was seated in the corridor. The question whether this amounts to public humiliation is a question for the jury.

coworkers of his status. At the time he was assigned the cleaning, he was wearing a three-piece suit. Again, this assignment could be viewed as harassing and humiliating. At work, management officials ignored Foley, speaking only to the individuals with Foley while deliberately snubbing him. Further, while the plaintiff had as many as fifteen different interviews for jobs within the company, a company management official stated that he was prepared to block any possible promotion for the plaintiff. Two upper management officials informed the plaintiff of their belief that the plaintiff was guilty of the charges despite his acquittal and that he would never be promoted. Foley suffered an emotional breakdown and was forced to take a medical leave of absence from work. The Polaroid psychiatrist found that Foley was suffering from "moderately severe agitated depression." Finally, company officials taunted the plaintiff with his inability to bring a successful suit against a company of Polaroid's size.[2]

Based on this evidence, I think the judge properly submitted the issue of intentional infliction of emotional distress to the jury.[3] See, e.g., *Boyle* v. *Wenk*, 378 Mass. 592, 597 (1979);

---

[2] In addition to these specific instances of conduct, behavior which amounts to an abuse of Polaroid's authority and power over the plaintiff must be considered in determining whether a cause of action for intentional infliction of emotional distress exists. See, e.g., *M.B.M. Co.* v. *Counce*, 268 Ark. 269, 281 (1980); *Agarwal* v. *Johnson*, 25 Cal. 3d 932, 946-947 (1979); *Hall* v. *May Dep't Stores*, 292 Or. 131, 138 (1981); Restatement (Second) of Torts § 46 comment e (1965); Prosser, Insult and Outrage, 44 Calif. L. Rev. 40, 47 (1956). Some courts have concluded that the plaintiff's status as an employee entitles him to greater protection from insult and outrage than if he and the defendant were strangers. *Alcorn* v. *Anbro Eng'g, Inc.*, 2 Cal. 3d 493, 498 n.2 (1970); *Hall, supra*.

[3] This case is not controlled by our decision in *Richey* v. *American Auto. Ass'n*, 380 Mass. 835 (1980), as Polaroid contends. In *Richey*, the employee missed work for one month, without giving the employer prior notice of his absence, which resulted in his discharge. *Richey, supra* at 838. We concluded that those facts did not constitute a jury question on intentional infliction of emotional distress. Here, Foley appeared at work ready and willing to assume his prior position. Moreover, Foley evidenced a willingness to do any work to which Polaroid would assign him. The evidence of Polaroid's repeated harassment and humiliation of Foley makes the *Richey* case inapposite.

*Agis* v. *Howard Johnson Co.*, 371 Mass. 140, 145 (1976). The upper management officials mistreating Foley were embarking on a deliberate course of conduct. Thus, there is evidence of enough intentional conduct to remove Polaroid's treatment of Foley from cases involving the ordinary trials and tribulations of the workplace. "Because reasonable men could differ on these issues, . . . 'it is for the jury, subject to control of the court,' to determine whether there should be liability in this case." *Agis, supra,* quoting Restatement (Second) of Torts § 46 comment h (1965). "It is for the court to determine whether on the evidence severe emotional distress can be found; it is for the jury to determine whether, on the evidence, it has in fact existed." Restatement (Second) of Torts § 46 comment j (1965). See, e.g., *Boyle, supra* at 597. See also *Borras* v. *Sea-Land Serv., Inc.*, 586 F.2d 881, 885 (1st Cir. 1978); *Smith* v. *Montgomery Ward & Co.*, 567 F. Supp. 1331, 1334-1335 (D. Colo. 1983). The trial judge who saw the witnesses could conclude that there was enough evidence to permit this to go to the jury. The record before us is cold and sterile. The propriety of Polaroid's management intentional conduct presents issues which "are mainly factual, and the conscience of the community — the jury — must be brought to bear, and the issue should not be resolved by the court." *Smith, supra* at 1335. After all, who better to determine that issue than people from all walks of life with all types of work experience.

The court makes a factual determination that Polaroid's actions were made in good faith.[4] On the evidence admitted at trial, the jury could find that Polaroid acted in good faith or the jury could find that Polaroid's conduct was extreme and outrageous and designed to humiliate Foley publicly. The jury could properly conclude that such conduct was unjustified and, as a result, impose liability. The jurors who saw the witnesses

---

[4] The employment between the plaintiff and Polaroid was terminable at the will of either party. See *Fortune* v. *National Cash Register Co.*, 373 Mass. 96, 100 (1977); *Fenton* v. *Federal St. Bldg. Trust*, 310 Mass. 609, 612 (1942). Although both the employer and the employee had the power to terminate the employment relationship, that does not preclude inquiry by the jury or the court into actions taken which fall short of termination.

were entitled to resolve the credibility issues. The court's decision also pays no deference to the judge's determination that the evidence was sufficient.

Although it is not explicitly stated, in my view, the court is concerned with the amount of the jury verdict. The remedy for that defect is not to invade the province of the jury, but to remand the case for remittitur or new trial. See Mass. R. Civ. P. 59 (a), 365 Mass. 827 (1974). Because in the light most favorable to the plaintiff there was "evidence worthy of consideration" on the claim of intentional infliction of emotional distress, the judge properly submitted this issue to the jury. See *Hartmann, supra.*

"The jury system [which] has for some hundreds of years been constantly bringing the rules of law to the touchstone of contemporary common sense[,]" 1 W. Holdsworth, A History of English Law 348-349 (3d ed. 1922), requires judges be respectful of the jurors' factual determinations. Because this court usurps the jury's fact-finding function, I respectfully dissent.