Connolly, J.
Plaintiff Deborah D. Williams (“Williams”) filed the instant action after she was terminated from her employment as a payroll clerk at the Brigham & Women’s Hospital, Inc. (“BWH”) by defendant Partners Healthcare Systems, Inc. (“Partners”). Partners terminated Williams after an investigation conducted in part by defendant First Security Services Corporation (“First Security") into the passing of forged BWH payroll checks. Williams alleges employment discrimination and retaliation in violation of G.L.c. 15 IB against BWH and Partners (Count I); libel and slander against all defendants (Count II); invasion of privacy in violation of G.L.c. 214, IB against all defendants (Count III); third-party beneficiary against all defendants (Count IV); intentional interference with a contract against First Security (Count V); violation of the Massachusetts Civil Rights Act, G.L.c. 12, 11H and 1, against First Security (Count VI); violation of the Massachusetts Equal Rights Act, G.L.c. 93, 102, against First Security (Count VII); and intentional infliction of emotional distress against First Security (Count VIII). All three defendants now move for summary judgment pursuant to Mass.R.Civ.P. 56. For the reasons to follow, BWH’s and Partners’ motions for summary judgment are ALLOWED, and First Security’s motion for summary judgment is ALLOWED in part and DENIED in part.
BACKGROUND
Williams first began working in the payroll department at BWH in February 1996 through Bullfinch Temps. On April 8, 1996, BWH hired Williams as a payroll clerk. Williams’ employer changed from BWH to Partners in July 1997, when the payroll department at BWH became centralized under Partners.[2]
As a payroll clerk, Williams’ duties included sorting and distributing checks, performing manual checks for corrections to payroll, and other clerical duties. Williams’ supervisor at BWH was Payroll Manager Mary Fitzpatrick (“Fitzpatrick”). Williams consistently received favorable job reviews during her employment at BWH and Partners.
On September 1, 1998, Williams informed Fitzpatrick that she had to leave work to see a doctor because of stomach problems. She then went to Planned Parenthood to be treated for complications resulting from a medical procedure.[3] On September 2, 1998 Williams called Fitzpatrick and told her she would be out of work until September 7, 1998.
On September 4, 1998, Williams called Planned Parenthood complaining of severe cramps, chest pain and light bleeding related to a medication she had been prescribed. She was told to stop taking the medication and to call if the bleeding worsened.
In addition to its own Department of Security, BWH contracted with First Security to provide additional manpower. On September 11, 1998, Robert Chicarello, Assistant Director of Security and Parking at BWH, received a telephone call from Partners informing him that someone was cashing forged BWH payroll checks in Providence, Rhode Island. The next day, Chicarello and Michael Forni, an employee of First Security who worked as an investigator for BWH and reported to Chicarello, met with Partners’ representative Len Rose (“Rose”). Rose told Chicarello and Forni that a check payable to “Wanda Almeida” for $758.13 was cashed at the Standard Liquor Store, Inc. *439 in Providence on September 4, 1998. Later that day, Wanda Almeida attempted to cash a second check for $754.36 at Checkpoint, Inc. in Providence.[4]
Chicarello and Forni conducted an investigation to determine if there was an employee or patient at BWH by the name of Wanda Almeida. Theyfound none. They discovered that Checkpoint had confiscated the forged check, the check cashing application and Wanda Almeida’s identification card. Forni then contacted the Rhode Island Secret Service, who were in possession of those papers, and on September 29, 1998 went to Providence to retrieve photocopies of the documents.
The photograph on the Wanda Almeida identification card was an African-American female. Forni, who was familiar with Williams, believed that the photograph resembled Williams. On September 30, 1998, Forni showed the photograph to Chicarello, who also stated that the photograph resembled Williams. Chicarello then showed the identification card to Fitzpatrick.[5]
Forni obtained samples of Williams’ handwriting from Human Resources and brought them to a handwriting expert to compare Williams’ handwriting with the handwriting on the Wanda Almeida check cashing application.[6]
On October 21, 1998, Forni met with Agent Fasulo of the Boston Secret Service and provided him with copies of the documents he had uncovered during the Wanda Almeida investigation. On October 23, 1998, Agent Fasulo called Williams and told her that she needed to come to the Thomas P. O’Neill Federal Building to speak with the Secret Service. Williams told Fitzpatrick about the Secret Service’s request and went to the Federal Building as requested.
At the Federal Building, Williams met with Forni, a Massachusetts State Trooper, Agent Fasulo and other members of the United States Secret Service. Williams was told that she was being interviewed about a forged BWH check. When asked where she was on September 4, 1998, she initially stated that she didn’t remember. Williams eventually told them that on September 4th she was at home recovering from complications from an abortion performed at Planned Parenthood. Also at this meeting, Williams, at the Secret Service’s request, completed handwriting forms.
At one point during this meeting, Forni spoke directly to Williams. First Security and Williams dispute whether she and Forni were alone at the time of their conversation, and also dispute the exact content of the conversation.[7]
In or around October 1998, Michael Kan (“Kan”), Director of Payroll, contacted Deborah Carlson (“Carlson”), a Human Resources Generalist at Partners, to inform her that a Partners employee was suspected of attempting to cash a fraudulent BWH check. Kan also told Carlson that outside agencies were involved in the investigation. Carlson then advised Joanne Salines (“Salines”), Labor Relations Manager, of the situation. They decided to suspend Williams pending the outcome of the investigation. Fitzpatrick told Williams that she was being suspended without pay when Williams returned from her meeting with the Secret Service.
A team of people was chosen to complete the investigation into Williams’ involvement in the check cashing scheme.[8] The team included Chicarello, Forni, Salines, Carlson and Kan. The investigation included a review of Williams’ attendance records and the policies in effect at Partners regarding the investigation. Carlson scheduled a meeting with Wiiliams for November 13, 1998.
On November 2, 1998, Williams filed a Charge of Discrimination with the Massachusetts Commission on Discrimination against BWH alleging racial discrimination. Carlson received a copy of this charge on November 9, 1998.
On November 13, 1998, Williams met with Forni, Chicarello, Salines, Kan and Carlson.[9] They showed Williams the Wanda Almeida identification card, check cashing application, fraudulent check, summary of Williams’ attendance records, the handwriting analysis results and a summary of the investigation conducted by First Security. To explain her whereabouts on September 4, 1998, Williams presented a form letter from Planned Parenthood dated November 10, 1998, which stated that Williams was unable to attend work from September 1, 1998 through September 4, 1998 due to a medical appointment. However, Williams did not provide any additional documentary or testimonial evidence as to her specific whereabouts on September 4, 1998.
Also at this meeting, Williams denied that the Wanda Almeida photograph looked like her.[10] Williams also stated that she felt they were only taking action against her because she was black. Williams further stated that, unless her name was cleared, she would hire an attorney.
After Williams left the meeting, the team decided to terminate Williams. On or about November 17, 1998, Williams received a letter from Kan notifying her that she was being terminated from Partners effective immediately.
Williams met with some of her former co-workers after her termination from Partners.[11] Williams told these people that Partners fired her because they suspected her of passing the forged checks in Providence. Until Williams told them, none of these coworkers had been aware of the reason for her termination.
No criminal charges were ever filed against Williams in connection with the fraudulent BWH payroll checks.
*440 DISCUSSION
Summary judgment “shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.” Mass.R.Civ.P. 56(c). The moving party bears “the burden of affirmatively demonstrating that there is no genuine issue of fact on every relevant issue raised by the pleadings.” Mathers v. Midland-Ross Corp., 403 Mass. 688, 690 (1988) (quoting Attorney General v. Bailey, 386 Mass. 367, 371 (1982)). A party moving for summary judgment who does not bear the burden of proof at trial may satisfy this burden by establishing that the non-moving party “has no reasonable expectation of proving an essential element of that party’s case.” Kourovacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). The burden then shifts to the non-moving party “to show with admissible evidence the existence of a dispute as to material facts.” Godbout v. Cousens, 396 Mass. 254, 261 (1985).
Count I. Violation of G.L.c. 15 IB (Williams vs. BWH and Partners)
A. Discrimination on the Basis of Race
General Laws c. 151B, 4(1) makes it unlawful ”[f]or an employer, by himself or his agent, because of the race [or] color ... of any individual to . . . discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment, unless based upon a bona fide occupational qualification.” Where, as here, there is no direct evidence of discrimination, the court follows a three-stage order of proof. First, the plaintiff employee has the burden of establishing a prima facie case of discrimination by showing that (1) she is a member of a protected classc (2) she performed her job at an acceptable level, (3) she was terminated and (4) her employer sought to fill her position by hiring someone similarly qualified. Abramian v. President & Fellows of Harvard College, 432 Mass. 107, 116 (2000); Blare v. Husky Injection Molding Sys. Boston, Inc., 419 Mass. 437, 441 (1995). Once a plaintiff establishes a prima facie case, this creates a presumption of discrimination. Abramian, 432 Mass. at 116.
Williams, as an African-American woman, is a member of a protected class under G.L.c. 15 IB. The record establishes that, up until the time of her suspension in October 1998, she performed her job at an acceptable level. It is undisputed that Williams was terminated on November 17, 1998. Finally, although there is no evidence in the record concerning the qualifications of the person who replaced Williams, the court will assume, for purposes this motion, that the person was similarly qualified. Accordingly, Williams has established a primafacie case of discrimination.
The burden thus shifts to Partners to articulate a lawful reason for its employment decision and to support that reason with credible evidence that it was in fact the real reason for its action. Abramian, 432 Mass. at 116-17; Blare, 419 Mass. at 442. Partners has satisfied this burden. The record provides ample evidence that Partners fired Williams because it believed that she was involved in passing fraudulent BWH payroll checks under the name “Wanda Almeida.” Two security personnel on the BWH campus who were familiar with Williams believed that the photograph of Wanda Almeida looked like Williams; Williams was absent from work on the date the fraudulent checks were passed; and Williams failed to provide any testimonial or documentary evidence as to where she was on that date (such as the names of friends or family who could corroborate her whereabouts or a receipt from a local drugstore).
The burden thus shifts back to Williams to show that “discriminatory animus was the determinative cause of the adverse employment decision.” Lipchitz v. Raytheon Co., 434 Mass. 493, 507 (2001). This is where Williams’ case falls short. There is no evidence in the record upon which to conclude that Partners’ decision to terminate Williams was based on anything other than the belief, mistaken or otherwise, that she was involved in the Wanda Almeida check cashing scheme. Williams has presented no evidence to support her claim of discriminatory animus by Partners. Accordingly, BWH and Partners are entitled to summary judgment on Williams’ claim of employment discrimination in Count I.
B. Retaliation
General Laws c. 151B, 4(4) makes it unlawful “[f]or any person, employer, labor organization or employment agency to discharge, expel or otherwise discriminate against any person because he has opposed any practices forbidden under this chapter or because he has filed a complaint, testified or assisted in any proceeding under section five.” Williams has the burden of proving that Partners’ desire to retaliate against her for filing a charge of discrimination with the MCAD was a determinative cause in its decision to terminate her employment. See Abramian, 432 Mass. at 121-22; Melnychenko v. 84 Lumber Company, 424 Mass. 285, 293 (1997). Williams cannot sustain this burden.
The events leading up to Williams’ termination were already set in motion at the time she filed the charge with the MCAD on November 2, 1998. Partners suspended Williams on October 23, 1998, pending an investigation into her involvement in the Wanda Almeida check cashing scheme. Partners’ reasons for believing that Williams was involved have already been recounted in the court’s discussion on the employment discrimination claim.
Williams correctly cites to Jalil v. Avdel Corporation, 873 F.2d 701 (3rd Cir. 1989), and Doe v. Kohn, Nast & Graf, P.C., 862 F.Sup. 1310 (D.Penn. 1994), for the proposition that protected activity by an employee, closely followed by termination, is evidence that the *441 termination was causally linked to the protected conduct. Jalil 873 F.2d at 708; Doe, 862 F.Sup. at 1317. However, the fact that Williams’ termination closely followed her protected conduct of filing an MCAD charge is not in and of itself sufficient to survive a motion for summary judgment on the retaliation claim, absent other evidence of retaliation. In both Jalil and Doe, there was other evidence supporting the employee’s claim of unlawful retaliation. See Jalil, 873 F.2d at 703, 708-09 (repeated instances of adverse employment consequences following protected activity culminated in employee’s termination); Doe, 862 F.Sup. at 1314-17 (employee’s termination after engaging in protected conduct followed threat to “blackball” employee if he filed suit against employer). Further, in Quiroga v. Hasbro, Inc., 934 F.2d 497 (1991), the Third Circuit Court of Appeals stated that, although in Jalil it found that the timing of an employee’s termination may suggest discriminatory motives, it “stopped short of creating an inference based upon timing alone.” Quiroga, 934 F.2d at 501.
Accordingly, because the only evidence of retaliation Williams has proffered is the fact that her termination occurred within a week of the date that Partners was notified of her MCAD claim, coupled with the fact that the events leading up to her termination were set in motion weeks before she filed her MCAD claim, the court finds that there is no genuine issue of material fact that Williams cannot prevail on her claim for retaliation. BWH and Partners are entitled to summary judgment on Williams’ claim for retaliation in Count I.
Count II. Libel and Slander (Williams vs. BWH, Partners and First Security)
“The elements of a libel case are a false and defamatory written communication of and concerning the plaintiff.” McAvoy v. Shufrin, 401 Mass. 593, 597 (1988). “The elements of a slander claim . . . are the publication of a false and defamatory statement by spoken words of and concerning the plaintiff.” Ellis v. Safety Ins. Co., 41 Mass.App.Ct. 630, 635 (1996). “Imputation of criminal conduct is defamatory per se.” McAvoy, 401 Mass. at 597-98. See also Jones v. Taibbi, 400 Mass. 786, 792 (1987).
However, “[a] qualified or conditional privilege . . . immunizes a defendant from liability unless he or she acted with actual malice ... or unless there is unnecessary, unreasonable or excessive publication, and the plaintiff establishes that the defendant published the defamatory information recklessly.” Mulgrew v. City of Taunton, 410 Mass. 631, 635 (1991) (citations and quotations omitted). Once a defendant has established that he or she had a qualified privilege to publish or write the defamatory statement, the plaintiff has the burden of showing that the defendant abused the privilege. Id. at 636; Foley v. Polaroid Corp., 400 Mass. 82, 94 (1987).
“An employer has a conditional privilege to disclose defamatory information concerning an employee when the publication is reasonably necessary to serve the employer's legitimate interest in the fitness of an employee to perform his or her job.” Foley, 400 Mass. at 94 (quoting Bratt v. International Business Machs. Corp., 392 Mass. 508, 509 (1984)) (brackets omitted). In this case, Partners had a conditional privilege to publish the defamatory statements concerning Williams’ suspected involvement in the check cashing scheme because it had a legitimate interest in determining whether one of its employees was involved in passing fraudulent BWH checks.
First Security also enjoyed a qualified privilege to publish the statements because it was acting on BWH’s behalf pursuant to a contract to provide security services. See Foley, 400 Mass. at 95 (qualified privilege exists “where the publisher and the recipient have a common interest, and the communication is of a kind reasonably calculated to protect or further it”) (quoting Sheehan v. Tobin, 326 Mass. 185, 190-91 (1950)).
Therefore, because Partners’ and First Security’s statements were conditionally privileged, Williams “has the burden to prove that the statements were made recklessly, that is, that they were unnecessary, unreasonable, or excessively published.” Foley, 400 Mass. at 95. See also Bratt, 392 Mass. at 514-15. Williams cannot meet that burden. She has presented no evidence that the defamatory statements regarding her alleged involvement in the check cashing scheme were published or revealed to anyone outside of the investigators and the supervisory personnel involved in the investigation. Williams herself concedes that her former co-workers were unaware of the reason for her termination until she told them.
Accordingly, as Williams cannot demonstrate that defendants abused their qualified privilege to publish defamatory information of or concerning her, defendants are entitled to summary judgment on Count II.
Count III. Invasion of Privacy (Williams vs. BWH, Partners and First Security)
General Laws c. 214, IB provides that “[a] person shall have a right against unreasonable, substantial or serious interference with his privacy.” Section IB has been interpreted by the courts to “proscribe . . . disclosure of facts about an individual that are of a highly personal or intimate nature when there exists no legitimate countervailing interest.” Mulgrew, 410 Mass. at 637 (quoting Bratt, 392 Mass. at 518). “(D)isclosure of private facts about an employee among other employees in the same corporation can constitute sufficient publication under the Massachusetts right of privacy statute.” Bratt, 392 Mass. at 519. However, in an employment situation, the reasonableness of an employer requiring an employee to disclose personal facts must be weighed against the employer’s legitimate business interests in acquiring the informa *442 tion. Cort v. Bristol-Myers Co., 385 Mass. 300, 307-08 (1982). Thus, because G.L.c. 214, 1B prohibits only unreasonable interferences with a person's privacy, “legitimate countervailing business interests in certain situations may render the disclosure of personal information reasonable and not actionable under the statute.” Bratt, 392 Mass. at 520. This is such a situation.
Williams claims that BWH, Partners and First Security violated her right to privacy by accusing her of a crime she did not commit, causing her to be interrogated by the Secret Service and by the investigation team, suspending her from her job and forcing her to reveal that she had an abortion. All of these interferences, however, were reasonable in light of the facts known at the time, and thus are not actionable under G.L.c. 214, 1B. As previously recounted, First Security and Partners had gathered enough information to warrant a good faith investigation into whether Williams was involved in the Wanda Almeida check cashing scheme.[12] The only challenged conduct which could arguably involve an invasion of Williams’ privacy is the fact that she was forced to reveal that she had an abortion. However, this revelation came about as a result of the inquiry into Williams’ whereabouts on September 4, 1998, the date the Wanda Almeida checks were passed. The defendants could not have been expected to know that Williams’ response would contain sensitive, private information. Further, defendants were justified in asking Williams to provide her whereabouts on the date the Wanda Almeida check was passed, given the information they had gathered. Thus, since G.L.c. 214, 1B “obviously was not intended to prohibit serious or substantial interferences which are reasonable or justifiedc” Schlesinger v. Merrill Lynch Pierce, Fenner & Smith, Inc., 409 Mass. 514, 518 (1991), defendants are entitled to summary judgment on Count III.
Count IV. Third-party Beneficiary (Williams vs. BWH, Partners and First Security)
Williams asserts that she is a third-party beneficiary under the security contract between BWH and First Security. She maintains that, because First Security agreed to provide security services to BWH, this included the protection and safety of those who work at BWH. Williams argues that First Security breached this contract by investigating her for a crime when it instead should have protected her as an employee. She contends that, as an intended beneficiary under the contract, she has the right to sue for the breach of that contract.
To recover as a third-party beneficiary, Williams must show that BWH and First Security “intended to give her the benefit of the promised performance.” Anderson v. Fox Hill Village Homeowners Corp., 424 Mass. 365, 366 (1997). Massachusetts has adopted Restatement (Second) of Contracts 302 (1981)[13] and “limitfs] enforcement by beneficiaries to those who are intended beneficiaries.” Miller v. Mooney, 431 Mass. 57, 62 (2000) (emphasis in original). For a party to be designated an intended beneficiary, it “must appear from ‘the language and circumstances of the contract’ that the parties to the contract ‘clearly and definitely’ intended the beneficiaries to benefit from the promised performance.” Id. (quoting Anderson, 424 Mass. at 366-67) (brackets omitted).
The purpose of the contract between First Security and BWH was to provide BWH with security services. (Pl.’s Statement of Material Facts Ex. E at 1.) There is no indication in the contract that BWH and First Security entered into it with the “clear and definite” intent to benefit Williams and others who work on the BWH campus. To the contrary, workers and patients at BWH are merely incidental beneficiaries, with no right to enforce the contract. Miller, 431 Mass. at 62; Anderson, 424 Mass. at 367. Accordingly, defendants are entitled to summary judgment on Count IV.
Count V. Intentional Interference with a Contract (Williams vs. First Security)
Williams alleges that First Security intentionally interfered with her at-will employment contract with Partners and caused her to lose her job. She asserts that First Security’s conduct was improper because it was done without any rational basis, in bad faith and with discriminatory animus.
Williams must prove four elements to establish the tort of intentional interference with contractual relations: (1) she had a contract with a third party, (2) First Security knowingly induced the third party to break that contract, (3) First Security’s interference was improper in motive or means, and (4) Williams was harmed by the interference. Wright v. Shiners Hosp. For Crippled Children, 412 Mass. 469, 476 (1992); Alba v. Sampson, 44 Mass.App.Ct. 311, 314 (1998).
Williams has established the first and fourth elements of this tort: there is no dispute that she had an employment contract with Partners, or that she was harmed by losing her job. Thus, the court must determine whether there is a genuine issue of material fact as to whether First Security knowingly induced Partners to breach its employment contract with Williams and whether it did so through an improper motive or by improper means.
“The propriety of an actor’s motives in a particular setting necessarily depends on the attending circumstances, and must be evaluated on a case-by-case basis.” G.S. Enterprises, Inc. v. Falmouth Marine, Inc., 410 Mass. 262, 273 (1991). Williams has proffered no evidence to support an inference that First Security acted with an improper motive or by improper means in investigating Williams. When Forni first learned of the fraudulent check passed by Wanda Almeida, he and Chicarello first conducted an investigation to determine if there was any Wanda Almeida connected with the hospital. It was not until after he saw the photograph of Wanda Almeida that he began to sus *443 pect that Williams may be involved. The investigation eventually led to more evidence against Williams, including the fact that Williams was out of work the day the fraudulent checks were passed and that she could not offer corroboration as to her whereabouts on that date. Further, Williams has offered no evidence of bad faith or discriminatory animus. Accordingly, First Security is entitled to summary judgment on Count V.
Count VI. Violation of the Massachusetts Civil Rights Act (Williams vs. First Security)
Williams claims that First Security has violated her civil rights in violation of G.L.c. 12, 11H, I. This statute, commonly known as the Massachusetts Civil Rights Act, provides, in pertinent part, “(a]ny person whose exercise or enjoyment of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, has been interfered with, or attempted to be interfered with, as described in section 11H[14] may institute and prosecute in his own name and on his own behalf a civil action ...”
"To establish a claim under the Act, a plaintiff‘must prove that (1) [her] exercise of enjoyment of rights secured by the Constitution or the laws of either the United States or the Commonwealth, (2) have been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by ‘threats, intimidation or coercion.’ ” Freeman v. Planning Bd. of West Boylston, 419 Mass. 548, 564 (1995) (quoting Bally v. Northeastern University, 403 Mass. 713, 717 (1989)) (brackets omitted).
“The Civil Rights Act was ‘intended to provide a remedy for victims of racial harassment.’ ” Bally, 403 Mass. at 718. However, "the Legislature did not intend to create ‘a vast constitutional tort,’ and thus explicitly limited the Civil Rights Act’s remedy to situations where the derogation of secured rights occurs by threats, intimidation or coercion.” Id. (quoting Bell v. Mazza, 394 Mass. 176, 182-83 (1985)).
Williams has offered no evidence of threats, intimidation or coercion. All of the circumstances alleged by Williams occurred during an investigation, supported by information gathered by First Security, into whether Williams was involved in passing fraudulent BWH payroll checks. At no time did Forni or anyone else at First Security attempt to threaten, intimidate or coerce Williams into giving up any rights secured by the laws or constitutions of the commonwealth or the United States. The only statement which arguably could support this cause of actionthe statement Forni allegedly made to Williams in front of others urging her to confess because the evidence against her was “strong,” does not rise to the level of threats, intimidation or coercion as required to support claim under .the Massachusetts Civil Rights Act. Accordingly, First Security is entitled to summary judgment on Count VI.
Count VIL Violation of the Massachusetts Equal Rights Act (Williams vs. First Security)
General Laws c. 93, 102(a), commonly known as the Massachusetts Equal Rights Act. provides, in pertinent part, “[a]ll persons within the commonwealth, regardless of sex, race, color, creed or national origin, shall have . . . the same rights enjoyed by white male citizens . . .” Williams asserts that First Security violated G.L.c. 93, 102 because Forni singled her out for investigation because of her race. In support of this contention, Williams argues that, when the “Diane Sampson” and other fraudulent checks were passed in the fall of 1998, Forni did not investigate the Caucasian payroll clerks. This, she argues, is sufficient evidence to create a genuine issue of material fact as to whether First Security violated the Massachusetts Equal Rights Act. It is not.
Forni did not immediately single out Williams for investigation once he found out a fraudulent check had been passed by an African-American woman. He did not begin to suspect Williams until he saw the Wanda Almeida identification card and concluded that it resembled Williams. Forni’s investigation into Williams was then corroborated by other evidence, including her absence from work that day and the lack of corroboration for her alibi. Williams does not contend that there was any evidence implicating the Caucasian payroll clerks in passing the other fraudulent checks which Forni failed to investigate or chose to ignore, other than the fact that the woman who passed the Diane Sampson check was Caucasian. Thus, the evidence contained in the record is insufficient to create a colorable claim under the Massachusetts Equal Rights Act. Accordingly, First Security is entitled to summary judgment on Count VII.
“[OJne who, by extreme and outrageous conduct and without privilege, causes severe emotional distress to another is subject to liability for such emotional distress.” Agis v. Howard Johnson Co., 371 Mass. 140, 144 (1976). Williams must establish four elements in order to recover for the tort of intentional infliction of emotional distress: (1) that First Security intended to inflict emotional distress or that it knew or should have known that emotional distress was the likely result of its conduct, (2) that its conduct was “extreme and outrageous,” was “beyond all possible bounds of decency” and was “utterly intolerable in a civilized communiiy,” (3) that First Security’s actions were the cause of her distress, and (4) that the emotional distress she sustained was “severe” and of a nature “that no reasonable man [or woman] could be expected to endure it.” Id. at 144-45; Restatement (Second) of Torts, 46 (1965).
A claim for intentional infliction of emotional distress “is an issue for the jury if reasonable people could differ on whether the conduct is ‘extreme and outra *444 geous.' "Vittands v. Sudduth, 49 Mass.App.Ct. 401, 411 (2000) (further citations omitted). The court finds that the issue of whether First Security’s conduct was “extreme and outrageous” is properly one for the jury. There is evidence in the record from which a jury could find the following facts: that Williams was a stellar employee; that she was out of sick the week of September 1, 1998, due to complications from an abortion; that, on the date the Wanda Almeida checks were passed, Williams was home suffering from severe cramping, chest pains and bleeding; and that she was not the woman on the Wanda Almeida identification card. There is a genuine issue of material fact as to whether First Security knew or should have known that its investigation of Williams and statements allegedly made to her and to her employer was “extreme and outrageous.” See Agis, 371 Mass. at 141, 145 (allegation that employer stated in front of all employees that someone was stealing, that he didn’t know who it was and thus would fire waitresses in alphabetical order, and then proceeded to fire plaintiff, was sufficient to make out a claim for intentional infliction of emotional distress). Accordingly, First Security is not entitled to summary judgment on Count VIII.
ORDER
For the reasons stated, the court ORDERS that the motions for summary judgment filed by defendants Brigham & Women’s Hospital, Inc. and Partners Healthcare Systems, Inc. are ALLOWED as to Counts I through IV. The court further orders that First Security Services Corporation’s motion for summary judgment is ALLOWED as to Counts II through VII and DENIED as to Count VIII.

 Williams contends that she was “jointly employed” by both BWH and Partners. However, this assertion is unsupported by the record. There is no evidence that BWH continued to be Williams’ employer after it merged with Partners. Indeed, subsequent to the merger, Williams’ paychecks were issued.solely by Partners. Thus, Williams was an employee of Partners who worked on the BWH campus.

 Williams had an abortion in August 1998.

 In addition to the two Wanda Almeida checks, there were between four and eight fraudulent BWH payroll checks cashed in the fall of 1998. Two of these checks were made out to “Diane Sampson.” The woman who cashed the Diane Sampson checks was Caucasian.

 defendants claim that, upon seeing the Wanda Almeida photograph, Fitzpatrick stated that it was Williams, but that she appeared to be wearing a wig. Defendants also assert that Fitzpatrick said that the handwriting on the check cashing application looked like Williams.’ Williams, however, maintains that Fitzpatrick told her that she tried to tell Chicarello and Forni that “Wanda Almeida” was not Williams.

 defendants claim, through the affidavit of Michael Forni, that Joan McCann and Associates conducted two comparisons of Williams’ and Wanda Almeida’s handwriting. They assert that the first comparison, which used photocopies of the women’s handwriting, indicated that it was “probable" that Williams filled out the Almeida check cashing application. Defendants state that the second analysis, which used originals of the women's handwriting, concluded that it was “more probable than not” that Williams’ handwriting was a match. However, as defendants did accompany their motions with a copy of Ms. McCann’s results or an affidavit from her stating her results, this is hearsay which the court will not consider in its memorandum.

 First Security claims that Forni was only present for the last five to ten minutes of the interview. Williams asserts that he was there for the entire interview.
First Security also maintains that Forni did not speak to Williams directly until Agent Fasulo left them alone for a moment. First Security asserts that Williams asked Forni “How could you do this to me? You know me,” to which Forni responded “If you did do it, tell the truth now. It will go easier on you in the end. What they want is the truth.” First Security claims Williams then stated that she was telling the truth.
Williams, however, claims that at least one other person was present when Forni made these statements. She also asserts that Forni said, “We know it’s you,” and “Why don’t you just tell the truth, the evidence against you is strong.”

 Although Williams disputes that Partners created a team to conduct an investigation, this dispute is based solely on Williams’ subjective belief that no investigation was conducted. Beliefs and suppositions, unsupported by any admissible evidence, are insufficient to raise a genuine issue of material fact at the summary judgment stage. Flesner v. Technical Communications Corp., 410 Mass. 805, 818 (1991).

 Defendants contend that the purpose of the meeting was to allow Williams to respond to the information that had been gathered during the investigation into her alleged involvement in the check cashing scheme. Williams contests this assertion and maintains that she was never asked to provide additional information at this meeting, nor was she ever asked to explain her side of the information gathered.

 The court has viewed Williams’ BWH employee identification card and the Wanda Almeida identification card and finds that there is a genuine issue of fact as to whether they are the same person. However, for reasons to be discussed, the fact that Williams may not have been “Wanda Almeida" is not material to the outcome of defendants’ summary judgment motions.

 Williams met with Sharon Garcia, Iris McGowan, Brandon Ward and Nairobi (Williams does not recall Nairobi’s last name).

 See the court’s discussion on Williams’ employment discrimination claim in Count I.

 Restatement (Second) of Contracts 302 (1981) states:
(1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiaiy if recognition of a right to performance in the beneficiaiy is appropriate to effectuate the intention of the parties and either (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or (b) the circumstances indicate that the promisee intends to give the beneficiaiy the benefit of the promised performance. (2) An incidental beneficiary is a beneficiaiy who is not an intended beneficiaiy.

 General Laws c. 12, 11H proscribes conduct by any person which interferes or attempts to interfere with a person’s rights secured by the United States Constitution or the Massachusetts Declaration of Rights, or by the laws of the same, by threats, intimidation or coercion.