Hamlin, Sandra L., J.
This is an action brought by the plaintiff, Gerard Boudreault (“Boudreault”), arising out of the termination of his employment by his former employer, defendant, Transkaiyotic Therapies, Inc. (“TKT”). The plaintiff alleges that improper and unlawful conduct on the part of TKT, and a third-party contractor, Chesapeake Biological Laboratories, Inc. (“CBL”) resulted in his being fired. The plaintiff brings three claims: Counts One and Three allege slander and intentional interference with contractual relations respectively, against CBL. Count Two alleges wrongful termination against TKT. CBL moves for summary judgment on Count One asserting that their communications with TKT regarding the allegations brought by CBL employees against the plaintiff were privileged, and that they did not abuse this privilege.
For the following reasons, the defendant, CBL’s, motion for summary judgment is ALLOWED.

BACKGROUND

At this summary judgment stage, the facts are reported in the light most favorable to the plaintiff. Anderson Street Associates v. City of Boston, 442 Mass. 812, 816 (2004), citing Augat, Inc. v. Liberty Mut. Ins. Co., 410 Mass. 117, 120 (1991).
TKT is a biotechnology company that develops biological products to treat diseases, and is headquartered in Cambridge, Massachusetts. CBL, located in Baltimore, Maryland, is a contract manufacturer that performed manufacturing services for TKT during the year 2000. The plaintiff was hired on or about January 31, 2000, by TKT as a contract manufacturer manager to manage TKTs relationship with its outside contract manufacturers, including CBL. His duties included serving as TKTs representative at CBL during manufacturing, and addressing issues TKT was having with CBL. As TKTs “man in the plant,” the plaintiff spent a significant portion of his time working at CBL.
Karen Kurtz (“Kurtz”), an assistant to CBL’s CEO Thomas Rice (“Rice”), testified that she complained to Rice in mid-September 2000, concerning an incident in which the plaintiff touched her in an inappropriate manner on her neck, shoulder and/or back area, which made Kurtz uncomfortable. Kurtz also reported the incident to the COO of CBL, John Botek (“Botek”), and informed the CBL executives that there were rumors concerning the plaintiff that they might want to investigate. Rice contacted Theresa Connolly, Esq. (“Connolly”), an employment lawyer at Piper Marbury Rudnick & Wolfe, LLP (“Piper Marbury”) for advice as to CBL’s proper course of conduct. Connolly advised Rice to investigate the allegations in a discreet manner because it potentially sounded in sexual harassment. The plaintiff disputes the sequence of events concerning Kurtz’s report of the alleged incident and CBL’s decision to contact Connolly.
Rice and Botek assert that they conducted an investigation and spoke with additional CBL employees. They claim that other employees disclosed other incidents of inappropriate conduct on the part of the plaintiff. One of these employees, Julie Baker Barnhill (“Barnhill”), allegedly reported that Kurtz had discussed the incident in which the plaintiff touched her inappropriately, and also that she dressed in a more conservative fashion when the plaintiff was present because she was uncomfortable with the way he looked at her. Another employee, Kenton Walker (“Walker”), allegedly reported to Botek that the plaintiff made a comment to the effect of, “Who did she * * * * to get her job?” when a female employee walked by. The plaintiff disputes that such an investigation took place, pointing out that Botek’s notes from the investigation have not been found, and that Kent Walker does not recall meeting with Rice and Botek. The plaintiff also asserts that Walker is not a credible witness.
Rice and Botek assert that based on further advice from Connolly regarding the investigation, they decided to ban the plaintiff from the premises. On or about September 15,2000, Rice and Botek telephoned William Fallon (“Fallon”), who served as the plaintiffs supervisor at TKT, as well as TKT’s Vice President of Manufacturing. They informed Fallon of the details of their investigation and of their decision to ban the plaintiff from the premises at CBL. On or about September 18, 2000, another phone call took place between TKT’s General Counsel, Michael Astrue *488 (“Astrue”), and CBL executives in which the CBL executives discussed the credibility of the complaints made by CBL employees. Again, the plaintiff disputes the sequence of events regarding CBL’s decision to contact Connolly, and its relation to the investigation and discussions with TKT executives.
The plaintiff met with Fallon and Astrue on September 22, 2000 and was informed that his employment was being terminated effective September 25, 2000. TKT contends that the termination was based on the fact that as the “man in the plant,” the plaintiff could no longer fulfill his duties if he was banned from the premises of CBL. The plaintiff asserts that ulterior motives existed for his termination, namely that he was preventing CBL from producing a drug, Replagal, that TKT was in a race with Genzyme to produce and distribute on the market for treatment of Fabiy’s disease in humans. The plaintiff asserts that CBL wanted him out of their plant, that the complaints of sexual harassment are groundless, and that the subsequent investigation may not have even occurred. The plaintiff emphasizes that no writing as to the investigation was found.
With regard to the production of Replagal, the plaintiff emphasizes that he was not allowed in the “fill room” where CBL thaws the concentrate, dilutes it, fills it into vials, and tests it before shipping. No clients Eire permitted in the fill room at CBL. The plaintiff requested permission to observe the process through an observation window, however CBL management does not allow clients in the manufacturing area. The plaintiff attests that there is nothing in the record to reveal whether the production process was rectified to address the problem of particulates in the June batch of vials, and that Good Manufacturing Practices (“GMPs”) were violated.
The Board of Directors at CBL decided to merge with a partner, Cangene, in late 1999. The merger was announced on or about October 30, 2000, and Can-gene conducted due diligence at CBL for the two weeks prior to the merger. The plaintiff asserts that the CBL President told him that prior management “put lipstick on a pig” when they were selling the company, and questions the sequence and decision of CBL to merge with Cangene.
The plaintiff started a company, Drug Development Research, Inc. (“DDR”), subsequent to his termination from TKT. Troy Chickering (“Chickering”), an employee of DDR, was requested by CBL executives to act as a project manager for a particular client at CBL. CBL executives claim they did not know that the plaintiff worked for DDR, but that they continued to use DDR because they saw no reason for the plaintiff to be onsite. The plaintiff states that he has been onsite at CBL and further asserts that DDR had been working with CBL on several projects until CBL found out that he owned the company. The plaintiff states that CBL eventually backed down and that he has worked onsite for them, and that he has managed Chickering the whole time he has worked for CBL.

DISCUSSION

Summary judgment is appropriate where the “pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.” Highland Ins. Co. v. Aerovox, Inc., 424 Mass. 226, 232 (1997), citing Mass.R.Civ.P. 56(c). In a case such as this, where the opposing party will have the burden of proof at trial, the moving party is entitled to summary judgment if they can demonstrate by reference to these materials, “unmet by countervailing materials, that the party opposing the motion has no reasonable expectation of proving an essential element of that party’s case.” Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). While the judge is bound to view the evidence in a favorable light to the plaintiff in this case, “the opposing party cannot rest on his or her pleadings and mere assertions of disputed facts to defeat the motion for summary judgment.” LaLonde v. Eissner, 405 Mass. 207, 209 (1989), citing Community Nat’l Bank v. Dawes, 369 Mass. 550, 554 (1976).
To withstand a motion for summary judgment in a defamation case, the plaintiff must show that: (a) the defendant made a statement, either written or orally, concerning the plaintiff to a third parly; (b) the statement could damage the plaintiffs reputation in the community; (c) the defendant was at fault in making the statement; and (d) the statement caused the plaintiff economic loss, or is actionable without proof of an economic loss. Ravnikar v. Bogojavlensky, 438 Mass. 627, 629-30 (2003). In order to prevail on such a claim at trial, a plaintiff must establish that a “defendant was at fault for the publication of a false statement regarding the plaintiff capable of damaging the plaintiffs reputation in the community, which either caused economic loss or is actionable without proof of economic loss.” White v. Blue Cross and Blue Shield of Massachusetts, Inc., 442 Mass. 64, 66 (2004).
CBL asserts that it is shielded from liability for slander pursuant to a conditional privilege. The SJC has held that an “employer has a conditional privilege to disclose defamatory information concerning an employee when the publication is reasonably necessary to serve the employer’s legitimate interest in the fitness of the employee to perform his or her job.” Foley v. Polaroid Corp., 400 Mass. 82, 94 (1987). In addition, the Court has held that a conditional privilege exists where the publisher and the recipient have a common interest and the communication is reasonably calculated to further that interest. Bratt v. International Business Machines Corp., 392 Mass. 508, 517 (1984), citing Sheehan v. Tobin, 326 Mass. 185, 190-91 (1950). However, the privilege can be lost if the defamatory information is published in a reckless manner, *489 which constitutes an abuse of the privilege. Bratt, 392 Mass, at 514.
The privilege does not protect a defendant where “the plaintiff proves that the defendant published the remark maliciously ... or recklessly ... In the absence of proof of malice, recklessness or ill will, the defense of privilege will prevail even if the remark was in fact false . . . The publisher’s lack of belief or lack of reasonable grounds for belief in the truth of the defamatoiy matter may, in the proper circumstances, constitute malice and, accordingly, extinguish the privilege.” Fowler v. Sohio Oil Company, 1990 WL 320042, *4 (D.Mass.), quoting Arsenault v. Allegheny Airlines, 485 F.Sup. 1373, 1379-80 (D.Mass. 1980). Mere negligence in the determination of the truth or in publication does not destroy the privilege. Bratt, 392 Mass, at 514, citing Retailers Commercial Agency, Inc., 342 Mass. 515, 522 (1961).
In this case, it is clear that a conditional privilege exists concerning the discussions between CBL and TKT regarding the incidents reported by CBL employees. CBL and TKT share a common interest in creating a productive and safe work environment for their employees, as well as in maintaining a strong business relationship based on trust and respect. Such candid communications are crucial to protecting the business interests of both companies, particularly with regard to such serious allegations.
The evidence clearly demonstrates that the publication of the allegations against the plaintiff that were reported by CBL employees was not unnecessary, unreasonable, or excessive. Although the plaintiff casts doubt as to the sequence of events regarding the reports of incidents to CBL executives, and as to the veracity of the investigation conducted by CBL executives, this does not relate to the publication of CBL’s asserted findings. The only potential publication of the reported incidents was between the executives at CBL and TKT, and legal counsel.
Rice contacted Connolly, an employment law attorney at Piper Marbury, as well as corporate counsel for CBL in seeking advice on the handling of the situation. Once CBL had conducted its investigation and decided to ban the plaintiff from the premises, they conveyed the information to Fallon and Astrue, the plaintiffs supervisor at TKT, and TKTs General Counsel respectively. The CBL executives were reasonable in reporting the incidents and their determination to ban the plaintiff from the premises. Clearly it was necessary to provide TKT a reason for taking such drastic measures against the plaintiff. The plaintiff cannot survive at this stage by simply speculating as to alleged gaps in the investigation or as to ulterior motives on the part of CBL.
The evidence also demonstrates that the publication was not made with reckless disregard for the truth or falsity of the information. In Fowler, 1990 WL 320042 at *5, the court held that an “employer must actually know that the statement is false, or disseminate it with ‘reckless disregard’ for whether it is true or not” in order to forfeit the conditional privilege. In this case, the plaintiff has not provided evidence that CBL executives disbelieved the reported incidents by Kurtz and other CBL employees. Therefore, the only remaining issue is whether their suspicions of the plaintiffwere “reasonably grounded.” Fowler, 1990 WL 320042 at *5.
In Fowler, the plaintiff was an employee of an oil company and was accused by his employer of stealing cash. Id. at *1. Two supervisors accused the plaintiff in a meeting without conducting an investigation into the matter. Id. Rather, the supervisors relied on the fact that the money that should have been deposited at the end of the plaintiffs shift was missing, and also on findings that the plaintiff had stolen small items from the company such as pens and trash bags. Id. The money was later found and the plaintiff was offered his job back, but he brought a claim for defamation. Id. at *2. The court focused on the sufficiency of the investigation, and stated that although more could have been done by the defendant, they were not legally required to do more. Id. at *5. The court relied on the fact that the employer had “reason to believe” that the criminal conduct occurred at the time they published the accusation. Id., citing Arsenault, 485 F.Sup. at 1380. “Imposing a duty of affirmative verification is not consistent with the conditional privilege.” Fowler, 1990 WL 320042 at *5.
In this case, while the plaintiff speculates as to the sequence of events and veracity of the investigation, he provides no affirmative evidence to dispute that the investigation took place. The investigation goes well beyond that conducted in Fowler, and is clearly sufficient to establish that CBL’s statements to TKT regarding the plaintiff were reasonably grounded. This type of investigation appears to be the type of “better procedure” that the Fowler court stated an employer should conduct before hastily taking action against an employee. Id. The investigation that CBL has conducted, and the plaintiffs inability to contest the reasonableness of it beyond mere speculation confirms that publication was not made with reckless disregard for the truth or falsity of the information.
Finally, with regard to the publication of the information to TKT, the evidence fails to demonstrate that the information was conveyed to TKT out of malice, spite or ill will on the part of CBL. The plaintiff argues that the absence of documentation of the investigation, instances of conflicting testimony, and the ulterior motive he asserts CBL had to keep him out of the plant creates a question of fact for a jury as to whether the statements were uttered with malice.
The SJC has held that the burden of showing that a privilege was extinguished by the defendants’ malice is on the plaintiff. Ezekiel v. Jones Motor Co., Inc., 374 Mass. 382, 390 (1978). In Ezekiel, the plaintiff was *490 pulled over by police who found items in his car that came from a shipment he had handled at work. Id. at 384. The plaintiff denied taking the items and stated that he did not know who had placed them in his car. Id. The plaintiff was discharged and at his appeal to the New England Joint Area Committee, a union grievance board, an employee of the company stated that he saw the plaintiff steal the items and place them in his car. Id. at 384-85. The Court stated that malice requires evidence of either an improper motive, an intent to abuse the occasion by resorting to it as a pretense, or reckless disregard of the rights of another. Id. at 390.
In Ezekiel, the Court determined that the jury could have determined that the defendant abused the conditional privilege because two managers at the company had previously informed the plaintiff that the company wanted to get rid of people like him who cost the company too much money. Id. at 390-91. This was direct evidence that the company had the motive to get rid of the plaintiff, and the juiy could have reasonably inferred that the employee made the statement to effectuate the company’s objective. Id.
In this case, the speculative nature of the plaintiffs theory of the case does not provide the same direct evidence as discussed above in Ezekiel. The plaintiff merely relies on conflicting testimony and other alleged shortcomings on the part of the defendant, such as the fact that notes were not available from the investigation. This does not amount to sufficient evidence of improper motive, an intent to abuse the occasion by resorting to it as a pretense, or a reckless disregard of the plaintiffs rights.
A common-sense approach also serves to discount the merits of the plaintiffs assertions. Serving as TKTs “man in the plant,” it is reasonable to assume that once CBL banned him from the premises, TKT would send a new person to fill the plaintiffs role. This new person would presumably serve the same functions and observe the procedures regarding the production of Replagal. It is fair to assume that this new person would raise the same issues to CBL and TKT executives if there were deficiencies in these procedures. Regarding the access to the fill room, CBL’s decision to not allow the plaintiff in the room was part of a company procedure designed for legitimate safety reasons. Further, while the plaintiff asserts the seriousness of the finding of foreign particles in the J une 2000 batch of Replagal, he testified that he did not report anything to the FDA, and that he would have if the problem warranted such attention.

ORDER

It is therefore ORDERED that the defendant, CBL’s, motion for summary judgment is ALLOWED.